UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER S. HERRICK'S )
CUSTOMS AND INTERNATIONAL )
TRADE NEWSLETTER, )
 )
      Plaintiff )
 )
      v. ) Civil Action No. 04-00377(JDB)
 )
U.S. CUSTOMS AND BORDER )
PROTECTION, )
 )
      Defendant )
 )

### DECLARATION OF LAURENCE CASTELLI, REVISED REDACTED SAMEPH AND VAUGHN INDEX

I, LAURENCE CASTELLI, DECLARE THE FOLLOWING:

1. I am the Chief of the Privacy Act Policy and Procedures Branch, Office of Regulations and Rulings, Customs and Border Protection ("Customs"), U.S. Department of Homeland Security (formerly the U.S. Customs Service, U.S. Department of the Treasury).

2. The Chief of the FOIA Appeals, Policy, and Litigation Branch ("FOIA Branch"), Regulations and Disclosure Law Division, Office of Regulations and Rulings, Customs and Border Protection, is normally the official charged with the following responsibilities: (1) reviewing initial FOIA decisions that are subject to administrative appeal; (2) giving guidance and instructions to Customs personnel regarding the processing of FOIA requests; (3) adjudicating administrative appeals that concern FOIA requests; and (4) overseeing all Customs activities related to information disclosure. This position is currently vacant due to the retirement of the previous Branch Chief, John

Elkins. As a result of the vacancy, the Privacy Act Policy and Procedures Branch, of which I am Chief, has retained responsibility for the FOIA request that is the subject of this litigation.

3. I am familiar with the procedures followed by the FOIA Appeals, Policy, and Litigation Branch, Regulations and Disclosure Law Division, Office of Regulations and Rulings, in responding to the FOIA appeal by, Peter S. Herrick's Customs and International Trade Newsletter, the Plaintiff in the above-captioned matter.

4. The statements made in the Declaration are made on the basis of: (1) my review of the official files and records of the FOIA Branch (formerly the Disclosure Law Branch); (2) my personal knowledge; or (3) information acquired by me in the course of the performance of my official duties.

5. By letter dated February 27, 2003 (Exhibit 1), the Plaintiff made a FOIA request seeking access to " . . . a copy of the <u>Fines, Penalties & Forfeitures Handbook</u> or its equivalent . . . that supersedes the <u>Fines, Penalties and Forfeitures Handbook</u>, HB 4400-01, April 1986–Revision."

6. By letter dated April 1, 2003 (Exhibit 2), the Executive Director, Trade Compliance and Facilitation, Office of Field Operations, advised that the <u>Mitigation Guidelines: Fines, Penalties, Forfeitures and Liquidated Damages, An Informed Compliance Publication</u>, April 2002, is available to the public for download on the Internet at www.customs.gov. The Executive Director also denied Plaintiff's request, in part, by withholding the <u>Seized Asset Management and Enforcement Procedures Handbook</u> (SAMEPH) (HB 3300-01A, January 2002) in its entirety pursuant to 5 U.S.C. § 552(b)(2).

7. By letter dated April 9, 2003 (Exhibit 3), the Plaintiff appealed the decision of the Executive Director in regard to the withholding of the SAMEPH in its entirety.

8. By letter dated June 9, 2003 (Exhibit 4), the official formerly charged with the duties I have since undertaken, Joanne Roman Stump, Chief of the Disclosure Law Branch, International Trade Compliance Division, Office of Regulations and Rulings, U.S. Customs and Border Protection, acknowledged receipt of Plaintiff's appeal and agreed with Plaintiff that portions of the 351 page SAMEPH could be released. However, Ms. Stump estimated that processing of the document for disclosure would take a GS-14 attorney eighteen (18) hours to complete. Ms. Stump therefore requested that Plaintiff submit a check, payable to the Bureau of Customs and Border Protection (CBP), for $988.38.

9. By letter dated June 13, 2003 (Exhibit 5), Plaintiff complied with Ms. Stump's request by submitting a check in the aforementioned amount.

10. Thereafter, Plaintiff contacted the FOIA Branch to request the status of his appeal on the following dates: June 9, 2003 (Exhibit 6), June 23, 2003 (Exhibit 7), September 10, 2003 (Exhibit 8), and November 25, 2003 (Exhibit 9).

11. In Ms. Stump's responses to Plaintiff's status requests, dated June 10, 2003 (Exhibit 10), June 24, 2003 (Exhibit 11), September 15, 2003 (Exhibit 12), and November 25, 2003 (Exhibit 13), she noted that Customs was acting with due diligence in handling Plaintiff's request. Furthermore, she explained that Customs was unable to process appeals within statutory timeframes due to a staffing shortage (see Open Am. v. Watergate Special Prosecution Force, 547 F. 2d 605, 614-16 (D.C. Cir. 1976) (citing 5 U.S C. § 552(a)(6)(c)). Ms. Stump advised Plaintiff that, inasmuch as he considered this delay to

be a denial of its appeal, Plaintiff could obtain judicial review pursuant to the provisions of 5 U.S.C. § 552(a)(4)(B) in the United States District Court in the district in which he resided, or in which the agency records are situated, or in the United States District Court for the District of Columbia.

12. On March 8, 2004, Plaintiff filed a Complaint for Injunctive Relief in the United States District Court for the District of Columbia (Exhibit 14) pursuant to 5 U.S.C. § 552, as amended, in this civil action. In Plaintiff's complaint, Plaintiff stated that he had exhausted its administrative remedies and requested that the Court, among other things, order Customs to immediately release the SAMEPH.

13. Along with the Complaint, on the same date, Ms. Stump also received a Summons In A Civil Case (Exhibit 15) to serve on Plaintiff's attorney an answer to the complaint within 30 days after service.

14. On May 28, 2004, Customs filed an Answer to Plaintiff's Complaint (Exhibit 16).

15. By letter dated August 10, 2004 (Exhibit 17), Ms. Stump indicated to Plaintiff that Customs administrative review of the SAMEPH was completed. She noted that Customs review time had far exceeded our original estimate as noted in her June 9, 2003 (Exhibit 4), correspondence. However, she waived the additional costs associated with this review. In reviewing the 351 pages of the document, she released 93 pages in their entirety. She also released 180 pages with partial redactions and withheld 78 pages in their entirety, pursuant to 5 U.S.C. §§ 552(b)(2), (b)(7)(E), and (b)(7)(F).

16. On August 30, 2004, Plaintiff filed an "Amended Complaint for Injunctive Relief" (Exhibit 18).

17. On October 15, 2004, Customs filed an "Unopposed Motion for Enlargement of Time to File its Motion for Summary Judgment and Vaughn Documentation" (Exhibit 19).

18. On September 22, 2005, The Honorable John D. Bates entered an Order directing that Customs "submit its updated and more detailed Vaughn index no later than 10/24/05."

19. In order to comply with the court's Order, I submit as Attachment A, a Vaughn Index, explaining the bases for Customs partial redactions and full withholdings with regard to the aforementioned pages.

## CUSTOMS MISSION AND THE SAMEPH

20. Customs mission includes the enforcement of the Customs laws of the United States and over 400 other laws on behalf of more than 40 other federal agencies. This mission includes the processing of passengers, conveyances, and merchandise entering into the United States. Among other things, Customs is tasked with assuring the proper payment of duties, compliance with the various statutes and regulations regarding the admissibility, health risks and safety of merchandise, along with the prevention of the smuggling of narcotics, migrants, explosives, pornographic material and other contraband, and the security of the Homeland.

21. Customs is also charged with thwarting the operations of terrorist organizations by detecting, disrupting, and preventing the cross-border travel of terrorists, terrorist funding, and terrorist implements, including weapons of mass destruction and their precursors. The creation and implementation of effective law enforcement procedures is paramount to achieving its mission. Disclosure of the information contained in the SAMPH would advise nefarious individuals and groups of Customs law enforcement

practices, procedures, and techniques, thus enabling such individuals and groups to circumvent the law, avoid detection, and evade apprehension.

22. In order to fulfill this mission, Customs has implemented standards and procedures that its employees must follow. The SAMEPH consolidates all of the standards and procedures in regard to the following: initiating seizure, penalty, or liquidated damage actions; processing and managing such actions; and handling seized property.

23. The SAMEPH is intended to aid special agents who at the time of issuance of the SAMEPH were part of the U.S. Customs Service and are now assigned to the Bureau of Immigration and Customs Enforcement ("ICE"), Department of Homeland Security), inspectors, import specialists, entry specialists, cashiers, paralegal specialists, and seized property specialists in administering Fines, Penalties, and Forfeitures/Seized Property (FP&F/SP) programs. It delineates roles and responsibilities for those personnel, as well as for their supervisors, port directors, Special Agents In Charge (SAIC), FP&F Officers (Fines, Penalties & Forfeiture Officers), Directors of Field Operations (DFO), and Headquarters Officers. Although no longer part of the same agency, both ICE and CBP officers continue to abide by the policies in the SAMEPH.

24. Customs Office of Field Operations, Seizures and Penalties Division, in coordination with the Office of the Commissioner, Seized Property Systems, is tasked with periodically reviewing and updating the SAMEPH with the most current information and statutory changes that affect the policies and procedures for documenting, processing, tracking, and reconciling Customs enforcement actions regarding seizures, seized property, penalties and liquidated damages.

Case 1:04-cv-00377-JDB   Document 32-1   Filed 01/27/06   Page 7 of 11

7

25. The SAMEPH was created for internal use only and was not intended for release to the public.

26. The Seized Asset And Case Tracking System (SEACATS) is a computer software program used by Customs to track seized and forfeited assets, penalties and liquidated damages, and certain general order merchandise transactions. SEACATS addresses both the financial and operational program management requirements necessary to adequately track, account, and report on these programs. It is noted that SEACATS is part of a system of records under the Privacy Act of 1974. In addition, SEACATS serves as the central repository for the Treasury Forfeiture Fund. Among other things, SEACATS is also utilized to: 1) provide accurate and timely management information; 2) measure performance; 3) track seized and forfeited property; 4) provide a single, accurate repository for case/incident information; and, 5) account and report on state and local asset sharing. SEACATS is discussed throughout the SAMEPH.

27. SEACATS was created for internal use only.

## EXPLANATION OF FOIA EXEMPTIONS EMPLOYED

28. The SAMEPH has been reviewed by my Branch line by line and page by page. Portions of the SAMEPH are still being withheld by Customs pursuant to Exemptions (b)(2), (b)(7)(E), and (b)(7)(F).

29. <u>Exemption (b)(2)—5 U.S.C. § 552(b)(2)</u>. This subsection exempts from mandatory disclosure matters that are " . . . related solely to the internal personnel rules and practices of an agency." The courts have construed Exemption (b)(2) to encompass two distinct categories of information: (a) internal matters of a relatively trivial nature, sometimes referred to as "low 2" information, see <u>Department of the Air Force v. Rose</u>, 425 U.S.

352, 369-70 (1976), and (b) more substantial internal matters, the disclosure of which would risk circumvention of a legal requirement, sometimes referred to as "high 2" information, see Crooker v. ATF, 670 F. 2d 1051, 1074 (D.C. Cir. 1981) (en banc).

30. The use of Exemption (b)(2) throughout the SAMEPH involves both "low 2" and "high 2" information and applies to the following general categories: administrative procedures in regard to the operational responsibilities discussed and assigned to Customs personnel (e.g., storage of seized property, processing of penalty, forfeiture, and liquidated damage actions, financial accounting for seized and forfeited property, destruction of contraband and prohibited merchandise, etc.), case file documentation, SEACATS input, pay grade/series information, and internal directives.

31. The "low 2" information withheld pursuant to Exemption (b)(2) consists of administrative markings relating to internal agency file control systems, internal agency administrative processes' status queries, and to the key stroke and function codes of internal agency computerized property management systems. These markings are purely internal and are utilized by Customs to assist in the management and control of its mission. As access to the file and computer systems is restricted from the public, the public has little or no interest in this information or the file markings and computer codes.

32. In contrast, where the public would have an interest in an internal Customs administrative marking, such as a case file number relating to an open Fines, Penalties, or Forfeitures case, this number is provided by Customs to the respective petitioner as a means of facilitating that administrative process.

33. The "high 2" information withheld pursuant to Exemption (b)(2) is predominantly internal and does not impact, in any substantive manner, upon Plaintiff. Specific

categories of "high 2" information include former Office of Investigations (now a part of ICE) and Office of Field Operations law enforcement procedures, including procedures for general seizures, high-risk seizures, and officer protection. Disclosure of this information to the public could facilitate improper access to sensitive Customs records. It could also interfere with Customs ability to maintain control of seized and forfeited property. Such property consists of contraband, prohibited merchandise, controlled substances, currency seized for money laundering, and other items used to facilitate the illegal entry of the seized property. Interference with Customs' legal responsibility, to interdict the entry into and ensure the exclusion from U.S. commerce of such merchandise, could possibly risk the lives of Customs and other agency personnel who are charged with carrying out the administrative procedures for the physical control, storage, transfer and destruction of said property.

34. Exemption (b)(7)(E)—5 U.S.C. 552(b)(7)(E). This subsection exempts from mandatory disclosure ". . . records or information compiled for law enforcement purposes . . . [which] . . . would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." In this case, Exemption (b)(7)(E) has been applied to information concerning Customs law enforcement, investigative techniques and procedures.

35. Exemption (b)(7)(E) for example, is employed where information gained through one investigation may lead to indications of other criminal activity, criminal activity by the same defendant unrelated to the primary investigation, or the location of assets of other criminal enterprises. While the existence of these techniques may be commonly known,

informing Plaintiff what techniques are set forth in the SAMEPH would inform others not as yet apprehended of Customs investigative efforts, thereby compromising Customs investigative capabilities in any unresolved portion of this case or future similar cases. Investigative techniques and procedures are subject to "categorical" protection when their disclosure would risk the circumvention of laws and regulations, impede effectiveness of law enforcement activities or associations, and compromise Customs investigatory practices and techniques. It is worthwhile to note that even commonly known techniques and procedures may be protected where the circumstances of their usefulness are not widely known. Disclosure of the information withheld pursuant to this exemption would advise violators or potential violators of law enforcement practices, procedures and techniques, thereby enabling them to circumvent the law, avoid detection and evade apprehension.

36. <u>Exemption (b)(7)(F)—5 U.S.C. § 5 52(b)(7)(F)</u>. This subsection exempts from mandatory disclosure information, the disclosure or release of which "could reasonably be expected to endanger life or physical safety of any individual." The primary purpose of this subsection is to protect the physical safety of individuals, including informants, law enforcement personnel, witnesses, their families, and others whose physical safety may be jeopardized if their identities were to become known. Officers responsible for securing, maintaining, and/or destroying seized and forfeited drugs (controlled substances), money-laundered currency, weapons, and other high value merchandise are at risk to their physical safety and security from those who would seek to regain possession of what was seized or those who are merely interested in acquiring seized contraband. In the instant case, the proposed disclosure of information relating to the

custody and transport of seized property places in jeopardy not only the officers charged with maintaining control of such property but also other third parties who may be in the vicinity of said officers at the time of transport.

37. <u>Review of SAMEPH for Segregability</u>:  Each page and each line contained in the SAMEPH, was evaluated by Customs for segregability. All information withheld was exempt from disclosure pursuant to a FOIA exemption. Where a page was redacted in its entirety, Customs determined that no meaningful portions could reasonably be released without revealing otherwise protected information. The pages withheld in full by Customs were carefully analyzed for segregability purposes. No reasonably segregable non-exempt information was withheld from Plaintiff.

I declare under penalty of perjury, that the matter and facts set forth in this Declaration fall within my official purview and, based upon my personal knowledge, information, and belief, are correct and true.

Executed on this ___26th___ date of __January__, 2006, in Washington, D.C.

*Laurence Castelli*
LAURENCE CASTELLI