UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

PETER S. HERRICK'S CUSTOMS AND
INTERNATIONAL TRADE
NEWSLETTER,

     Plaintiff,

          v.

U.S. CUSTOMS AND BORDER
PROTECTION,

     Defendant.

Civil Action No. 04-00377 (JDB)

## MEMORANDUM OPINION

Plaintiff Peter S. Herrick's Customs & International Trade Newsletter ("Herrick's")

submitted a Freedom of Information Act ("FOIA") request to defendant U.S. Customs & Border

Protection Bureau ("Customs") in late February 2003, requesting a copy of Customs' "Fines,

Penalties & Forfeitures Handbook," or equivalent material. Customs initially withheld all 351

pages of the pertinent publication, entitled Seized Asset Management Enforcement Procedures

Handbook ("SAMEPH"), claiming exemption from disclosure under 5 U.S.C. § 552(b)(2). In

response to Herrick's written appeal, Customs acknowledged that portions of the SAMEPH

could be released. The ultimate result was that: (1) seventy-eight pages were fully withheld; (2)

1

180 pages were released with partial redactions; and (3) ninety-three pages were released in their entirety.[1]

Customs describes SAMEPH as an internal publication that "consolidates all of the standards and procedures in regard to initiating seizure, penalty, or liquidated damages actions; processing and managing such cases; and handling seized property."  See Declaration of Joanne Roman Stump & Vaughn Index at 5 ("Stump Decl.").  Herrick's seeks to enjoin Customs from withholding the undisclosed material; Customs claims that the material is exempt under 5 U.S.C. §§ 552(b)(2), (b)(7)(E), and (b)(7)(F) ("Exemption 2," "Exemption 7(E)," and "Exemption 7(F)").  Customs initially submitted a Vaughn index and the declaration of Ms. Joanne Roman Stump, the FOIA Appeals Officer and Chief of the Disclosure Law Branch at Customs.  This Court determined, however, that more specificity was needed, and ordered Customs to submit a more detailed and comprehensive Vaughn index.  See Herrick's, 2005 WL 3274073, at *4.  The Court was particularly concerned about Customs' failure to differentiate "high 2" information from "low 2" information under Exemption 2, the Vaughn index's inclusion of exemptions upon which Customs no longer relied, and the failure to satisfy the Court that a proper segregability analysis had been undertaken.  Id. at **2-4.

Thereafter, Customs submitted a new Vaughn index, a copy of the redacted version of the SAMEPH received by plaintiff (containing handwritten notations in the margins that identified

---

[1]The facts of this case and the statutory framework of FOIA are set forth in the Court's previous Memorandum Opinion and will not, except where particularly relevant, be repeated here.  See Peter S. Herrick's Customs & Int'l Trade Newsletter v. U.S. Customs & Border Protection, 2005 WL 3274073 (D.D.C. Sep. 22, 2005).

which exemption was claimed for each piece of information), and a new declaration from Ms.

Stump's successor, Mr. Laurence Castelli.  Customs also filed a renewed motion for summary

judgment, following which plaintiff renewed its cross-motion for summary judgment.  The

redacted copy of the SAMEPH does not always differentiate the information withheld under

Exemption 2 as "high 2" or "low 2," although the new Vaughn index includes explanations for

both "high 2" and "low 2" withholdings.  Moreover, the new Vaughn index does not fully explain

how the disclosure of information designated as "high 2" or withheld under the second clause of

Exemption 7(E) would risk circumvention of legal objectives or agency regulation.  Although the

Castelli Declaration links such harms to the broad classes of information withheld pursuant to

each claimed exemption, the submissions alone do not enable the Court to determine whether

each piece of information withheld satisfies the requirements of the FOIA exemption claimed.

Nor can the Court determine which of several harms identified in the Castelli Declaration are

linked to each individual piece of information identified as exempt on the Vaughn index.

Although there was no genuine dispute of material fact, the submissions of Customs and

the memoranda of the parties were thus insufficient to enable the Court to resolve all exemption

claims and the parties' motions.  Accordingly, the Court ordered defendant to submit for in

camera review an unredacted version of the SAMEPH in its entirety.  See Peter S. Herrick's

Customs & Int'l Trade Newsletter v. U.S. Customs & Border Protection, Civil Action No. 04-

0377 (D.D.C. Apr. 27, 2006) (Order).  After having reviewed the SAMEPH in light of the FOIA

exemptions claimed by Customs, and having considered the arguments advanced by both parties

throughout the course of this litigation, the Court will grant Customs' motion in part and deny it in part, and will grant plaintiff's motion in part and deny it in part.

## LEGAL STANDARDS

**1.  Summary Judgment Pursuant to Fed. R. Civ. P. 56(c)**

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The party seeking summary judgment bears the initial responsibility of demonstrating that no genuine dispute of material fact exists.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The moving party may successfully support its motion by "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. (quoting Fed. R. Civ. P. 56(c)).

To determine whether there is a genuine issue of material fact sufficient to preclude summary judgment, a court must regard the non-moving party's statements as true, and accept all evidence and make all inferences in the non-moving party's favor.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Nevertheless, a non-moving party must establish more than the "mere existence of a scintilla of evidence" in support of its position, id. at 252, although the moving party need only point to the absence of evidence proffered by the non-moving party, Celotex, 477 U.S. at 322.  Summary judgment is appropriate if the non-moving party fails to

offer "evidence on which the jury could reasonably find for the [non-moving party]." Anderson, 477 U.S. at 252; see also Holbrook v. Reno, 196 F.3d 255, 259-60 (D.C. Cir. 1999).

## 2. **Legal Framework under FOIA**

Congress enacted FOIA for the purpose of introducing transparency to government activities. See Stern v. FBI, 737 F.2d 84, 88 (D.C. Cir. 1984). Congress remained sensitive, however, to the need to achieve balance between this objective and the vulnerability of "legitimate governmental and private interests [that] could be harmed by release of certain types of information." Critical Mass Energy Project v. Nuclear Regulatory Comm'n, 975 F.2d 871, 872 (D.C. Cir. 1992). Accordingly, FOIA provides for nine exemptions pursuant to which an agency may withhold requested information. See 5 U.S.C. §§ 552 (b)(1)-(9).

When an agency asserts a FOIA exemption as the basis for withholding requested information, this Circuit will ordinarily require an agency to produce a Vaughn index, which describes the records, or portions thereof, that the agency has withheld. See Vaughn v. Rosen, 484 F.2d 820, 827 (D.C. Cir. 1973); Edmonds Inst. v. United States Dep't of the Interior, 382 F. Supp. 2d 105, 107 (D.D.C. 2005). The Vaughn index must include "a description of each document withheld, and an explanation of the reason for the agency's nondisclosure." Oglesby v. United States Dep't of Army, 79 F.3d 1172, 1176-77 (D.C. Cir. 1996). On a motion for summary judgment, the Vaughn index becomes central not just to the court's determination of whether or not the agency has produced all reasonably segregable portions of the responsive material, but also to the court's determination of whether or not the claimed exemptions are sustained.

The purpose of the <u>Vaughn</u> index is to provide fertile ground upon which to germinate the seeds of adversarial challenge by providing an adequate synopsis of the withheld information and the reasons for the exemption claim, <u>see</u> <u>Nat'l Treasury Employees Union v. United States Customs Serv.</u>, 802 F.2d 525, 527 (D.C. Cir. 1986), so as to eliminate the need for automatic submission of the documents themselves.  <u>In</u> <u>camera</u> reviews are not only burdensome for the court, but may also be misinterpreted as reflecting judicial distrust of agency determinations, thereby facilitating tension between the branches.  <u>See</u> <u>Cox v. United States Dep't of Justice</u>, 576 F.2d 1302, 1312 (8th Cir. 1978).  If a court determines that a <u>Vaughn</u> index is insufficient, however, an <u>in</u> <u>camera</u> review is appropriate.  The focus then shifts from the <u>Vaughn</u> index to the actual relationship between the claimed exemptions and the redacted material -- the agency's ability to survive or obtain summary judgment is directly linked to whether the information withheld is properly contemplated by the designated exemption, as described in the statute and elucidated by the case law.   The posture of a district court in the FOIA context differs from the ordinary situation in which the court is called upon to review agency action, then, because the agency is not entitled to deference.  <u>See</u>, <u>e.g.</u>, <u>Judicial Watch v. United States Dep't of Commerce</u>, 83 F. Supp. 2d 105, 109 (D.D.C. 1999); <u>see</u> <u>also</u> <u>Dep't of Justice v. Reporters Comm. for Freedom of the Press</u>, 489 U.S. 749, 755 (1989).   The withholdings are reviewed <u>de</u> <u>novo</u>, and the issue is whether the information was properly withheld.  <u>See</u> <u>Judicial Watch</u>, 83 F. Supp. 1d at 109.

**ANALYSIS**[2]

**I.  Exemption 2**

Customs has withheld much information based on Exemption 2.  This exemption applies to two species of material:  (1) "high 2" information, which is information that, if disclosed, would risk circumvention of lawful agency regulation; and (2) "low 2" information, which is information relating to internal matters of a trivial, administrative nature.  See, e.g., Schiller v. NLRB, 964 F.2d 1205, 1207 (D.C. Cir. 1992).  The withholdings at issue concern both "high 2" and "low 2" information.  Based on a review of the Vaughn index, the Castelli Declaration, the redacted and hand-annotated version of the SAMEPH, and the unredacted version of the SAMEPH, the Court has determined which information was withheld as "low 2" rather than "high 2."

**A.  Low 2**

The information designated as "low 2" concerns such trivial matters as: (1) file and label numbers; (2) time deadlines for personnel; (3) input codes and criteria; (4) maintenance, updating, use, operation, and functions of the administrative case management system ("SEACATS"); (5)

---

[2]Plaintiff spends much time arguing that the SAMEPH as a whole is an administrative staff manual (rather than a law enforcement manual) that must be disclosed under § 552(a)(2)(C). However, the Court must consider the character of each particular withholding, not the manual as a whole. Mead Data Central, Inc. v. United States Dep't of the Air Force, 566 F.2d 242, 260 (1977). Moreover, as long as the information falls within an exemption, Customs is well within its rights to withhold it -- even if § 552(a)(2)(C) otherwise mandates disclosure. To be sure, however, certain exemptions require a nexus between the specific withholdings and a legitimate law enforcement purpose. E.g., § 552(b)(7)(E), (F).

internal administrative duties and procedures regarding the cataloging and labeling of cases and paperwork; (6) the completion of paperwork; (7) procedures for escalating to supervisors or contacting other employees before certain actions may be taken; (8) criteria for extending administrative deadlines, using new forms, dispensing with recording, labeling, or format requirements; (9) self-monitoring reports, audits, surveys, and procedures; (10) inventory frequency, procedures, and requirements; (11) titles of internal procedural memoranda and directives; and (12) the names of groups and titles of officers responsible for such administrative duties.  This type of information is quintessentially internal, and cannot convincingly be described as being of genuine public interest.  See Schwaner v. Dep't of Air Force, 898 F.2d 793, 794 (D.C. Cir. 1990) (describing "low 2" information as material that "relates to trivial administrative matters of no genuine public interest.").  "[I]nternal time deadlines and procedures, recordkeeping directions, instructions on which agency officials to contact for assistance, and guidelines on when clearance from [other departments] is necessary for certain decisions" are "housekeeping matters appropriately withheld under [E]xemption 2."  See Schiller, 964 F.2d at 1208.  Moreover, plaintiff has several times stated that he does not seek the disclosure of any "low 2" or SEACATS-related information.  See, e.g., Pl.'s First Mem. Supp. at 5; Pl.'s Renewed Opp'n/Reply at 2.  Hence, summary judgment will be granted in favor of Customs with respect to all "low 2" material (unless otherwise noted in footnote ten, infra).

**B.  High 2**

The "high 2" information concerns more substantial agency matters, including: (1) the transport of seized property; (2) guidelines for customs officials regarding how to make a seizure;

(3) discrepancies in weights, measures, and amounts of seized or stored property; (4) testing and

storage of, access to, physical security for, and inventory of seized materials; (5) procedures for

establishing and changing vault and safe combinations; (6) guidelines and evaluative factors for

granting humanitarian aid, which, if known, would be easily manipulable by law violators; and (7)

guidelines for accepting offers in compromise, which is akin to litigation strategy and is also

easily manipulable by adverse parties.  To qualify as "high 2," the material must be predominantly

internal and of such a nature that its disclosure would significantly risk circumvention of lawful

agency regulation or a legal objective.  See, e.g., Crooker v. Bureau of Alcohol, Tobacco &

Firearms, 670 F.2d 1051, 1073-74 (D.C. Cir. 1981).  The agency is not required to identify a

specific regulation or statute.  Nat'l Treasury Employees Union v. United States Customs Serv.

("NTEU"), 802 F.2d 525, 530-31 (D.C. Cir. 1986).

     The "predominantly internal" nature of the information described is sufficiently apparent.

The SAMEPH delineates the roles, responsibilities, procedures, and guidelines for law

enforcement operations.[3]   There is very little in the SAMEPH that fits the description of what

---

[3]This is not to suggest that the Court has analyzed the SAMEPH as a single item.  As already
noted, "the focus in the FOIA is information, not documents[.]" Mead Data Central, 566 F.2d at
260.  The Court has considered the individual components of the SAMEPH as they relate to the
applicable exemptions.  Plaintiff is correct that these matters may have some tangential impact on
members of the public, and that they may, accordingly, be of some public interest.  But "'any
'internal personnel rules and practices of an agency ' [have] some effect on the public-at-large.'"
Schiller, 964 F.2d at 1207 (quoting Crooker, 670 F.2d at 1073).  The information here is
nevertheless predominantly internal, because it details (among other things) litigation strategies,
tactics and methods for Customs employees to follow with respect to their official law
enforcement duties, and information regarding the management, storage, maintenance, transport,
security, and testing of seized contraband under their control.

plaintiff seeks (i.e., that concerns the assessment of fines and penalties, or that is helpful for

lawfully reacquiring improperly seized property).  The information that does seem responsive

appears to have already been disclosed.  See SAMEPH at 64 ¶ 6(a); see also SAMEPH Chs. 3, 4

(addressing liquidated damage and penalty cases, releasing most of the information in those

chapters to plaintiff, and redacting only "low 2" information relating to SEACATS and other

trivial administrative matters -- information plaintiff no longer seeks).  The information properly

withheld as "high 2" does not purport to regulate interactions involving members of the public,

and in no way constitutes the "secret law" at which FOIA takes aim.  See Schiller, 964 F.2d at

1207; Crooker, 670 F.2d at 1073; Cox v. United States Dep't of Justice, 601 F.2d 1, 5 (D.C. Cir.

1979).  Rather, the material consists of sensitive information regarding specific law enforcement

procedures and operations.  Agency guidelines that seek "only to instruct agency personnel" and

"d[o] not attempt to modify or regulate public behavior -- only to regulate it for illegal activity" --

are properly withheld under Exemption 2.  Wiesenfelder v. Riley, 959 F. Supp. 532, 535 (D.D.C.

1997) (citing Crooker, 670 F.2d at 1075).

Moreover, the disclosure of this information would risk circumvention of important legal

objectives.  See Castelli Decl. at 8-9 ¶ 33.  If the information became publicly known, then

individuals seeking to evade capture by customs officials, to smuggle illegal contraband into the

country, to reclaim or otherwise obtain seized contraband, or to harm customs officials or impede

operations would be privy to the most effective ways in which to do so.  It can hardly be doubted

that knowledge of, for example, the number of customs officials present to guard or transport

high-risk contraband, the location of such items and the length of time that they are stored, and

whether customs officials are armed would aid in the accomplishment of nefarious objectives.[4]

To mitigate or nullify the information's value to law violators, Customs would need to modify or

eliminate it.  Not only, then, is the information crucial to Customs' effective enforcement of its

legal objectives, but it is also intertwined with overarching concerns of national security.  Hence,

"disclosure of [the information] would render [it] operationally useless" or obsolete.  See NTEU,

802 F.2d at 530-31.

      Plaintiff's argument that the risk of circumvention must be almost certain is wrong.

Under the governing legal authority, the word "significant" does not carry the meaning that

plaintiff suggests.  Rather, the test is satisfied so long as the information could assist individuals

seeking to avoid or hinder lawful agency regulation.  See Schiller, 964 F.2d at 1208; NTEU, 802

F.2d at 530-31; see also Crooker, 670 F.2d at 1075 (concluding that disclosure of the material at

issue "might" help law violators evade detection).[5]   Where, as here, the information is

---

[4] Plaintiff's assurance that he does not intend to circumvent lawful agency regulation and would
not knowingly disclose the SAMEPH to any individuals who would do so, see Pl.'s First Mem.
Supp. at 11, is irrelevant.  Plaintiff intends to offer the SAMEPH for sale in CD-Rom format and
to make it available on the internet.  Indeed,  plaintiff is already selling the released portions of
the SAMEPH on its website, http://www.customslawyer.net/handbook.htm (last visited June 30,
2006), for the sum of $100.00.  Accordingly, plaintiff can hardly guarantee that other members of
the vast, diverse "public," having more malicious motives than plaintiff, will not be enabled.
Once information enters the stream of public accessibility, it is readily obtainable by the
honorable and dishonorable alike.  The Court must consider all "possible uses [of the material]
by any member of the public," and will not "speculat[e] about what use [plaintiff] intends to
make of the information if it is disclosed."  Cox, 576 F.2d at 1305.

[5] Plaintiff's reliance on Hawkes v. IRS, 507 F.2d 481, 483-85 (6th Cir. 1974), is misplaced. To
begin with, Hawkes involved a more rigorous legal standard than that used in this Circuit, under
which the agency must show that disclosure would have the "sole effect" of enabling
circumvention of the law.  Id. at 483.  Moreover, the IRS and Customs perform materially
different functions.  IRS agents are not typically responsible for homeland security, and do not

predominantly internal and would enable a suspect to "change his pattern of [illegal activity] in order to avoid detection and apprehension," the information qualifies as "high 2." Wilson v. DEA, 414 F. Supp. 2d 5, 12 (D.D.C. 2006).

## II. **Exemption 7**[6]

Exemption 7 protects six different classes of law enforcement information. § 552 (b)(7)(A)-(F).  Customs has withheld information based upon subpart (E) and subpart (F) of Exemption 7.  The Court must, as a threshold matter, consider whether the information was created or maintained for law enforcement purposes.  See § 552(b)(7).  The pivotal inquiry is whether there is a nexus between the agency's law enforcement duties and the information withheld.  See Keys v. United States Dep't of Justice, 830 F.2d 337, 340 (D.C. Cir. 1987); see also Pratt v. Webster, 673 F.2d at 420-21.  Plaintiff concedes that "Customs['] mission includes the enforcement of the Customs laws of the United States and over 400 other laws on behalf of more than 40 other agencies," including the prevention of terrorist operations.  Castelli Decl. at 5 ¶¶ 20-21; Pl.'s First Mem. Supp. at 4 (incorporated and re-adopted by reference in Pl.'s Renewed Mot. at 1).  Customs claims that the SAMEPH's purpose is to assist officials in effectively carrying out these law enforcement and homeland security responsibilities, id. at  ¶¶ 22-23, and the Court's in

---

ordinarily intercept shipments of high-risk and illegal contraband, or face armed confrontation on a daily basis.  These are, however, the very matters addressed in the SAMEPH.

[6]Plaintiff faults Customs for relying on Exemptions 7(E) and 7(F), referencing footnote one of the Court's previous Memorandum Opinion (which stated that the Court would not address the propriety of those exemptions at that time).  See Pl.'s Renewed Mem. Supp./Opp'n at 9.  Plaintiff is apparently confused.  The Court never suggested that Customs' reliance on those exemptions was improper -- rather, it simply reserved such issues until the next round of briefing, based on a revised Vaughn index.

camera review confirms that assertion.  Indeed, the vast majority of withheld information in the

manual consists of procedures, guidelines, and techniques that are designed directly to advance

the agency's pursuit of its criminal law enforcement duties.  Contrary to plaintiff's assertion, the

fact that the agency may maintain other manuals for law enforcement purposes does not mean that

qualifying portions of the SAMEPH are not also protected.  Accordingly, the withheld

information satisfies the threshold requirement of Exemption 7.

A fraction of the manual also addresses matters relating to oversight of employees --

specifically, the involvement of internal affairs and the circumstances under which employees will

be investigated for limited classes of misconduct.  "An agency's general monitoring of its own

employees to ensure compliance with the agency's statutory mandate and regulations" is not a law

enforcement purpose under Exemption 7.  See Stern, 737 F.2d at 89.  As previously stated, the

Court's focus is not on the manual as a whole, but on each individual, informational component.

See, e.g., Mead Data Central. 566 F.2d at 260.  The segments of the manual that concern

employee oversight and internal affairs may more accurately be said to involve Customs as an

employer rather than as a criminal law enforcement agency.  Accordingly, these portions of the

manual would seem, at first blush, to lack the requisite law enforcement nexus.  But the D.C.

Circuit has held in Stern v. FBI that if the personnel oversight and investigation procedures

concern misconduct that violates the law, then the information may be deemed to meet the

threshold requirement of Exemption 7.  See 737 F.2d at 89, 90.  Here, the few sentences at issue

concern possible tampering with and theft of evidence and illegal contraband.  Accordingly, that

information also satisfies the threshold requirement of Exemption 7.[7]

### A.  Exemption 7(E)

Exemption 7(E) protects two kinds of information: (1) that which "would disclose

techniques and procedures for law enforcement investigations or prosecutions;" and (2) that which

"would disclose guidelines for law enforcement investigations or prosecutions if such disclosure

could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E); see, e.g.,

Judicial Watch, 337 F. Supp. 2d at 181.  The first clause of the exemption provides "categorical"

protection, requiring no demonstration of harm or balancing of interests.  See Judicial Watch, 337

F. Supp. 2d at 181.  The universe of information that qualifies for such categorical protection is

limited to techniques and procedures that are: (1) not generally known to the public, see Campbell

v. United States Dep't of Justice, No. 89-3016, slip op. at 6 (D.D.C. Aug. 6, 1997); (2) may be

generally known, but the circumstances of their usefulness are not, see Wickline v. FBI, 1994 WL

549756, at *5 (D.D.C. Sept. 30, 1994) (quoting Parker v. United States Dep't of Justice, No. 88-

0760, slip op. at 8 (D.D.C. Feb. 28, 1990), aff'd in pertinent part, No. 90-5070 (D.C. Cir. June 28,

1990)); or (3) may be generally known, but public disclosure could erode their effectiveness, see,

---

[7]It is noteworthy that the material does not consist of "rules and practices by which [the] agency regulates its own staff," Cox, 601 F.2d at 5, or standards for evaluating adherence to agency protocol.  Rather, the information concerns the reporting of discrepancies that may trigger an investigation, which supervisors and oversight groups to contact in order to do so, and how such matters are catalogued using internal software and recording procedures.  If this information became public, it would disclose the precise amount of merchandise that could be stolen without triggering agency suspicions.

e.g., Piper v. United States Dep't of Justice, 294 F. Supp. 2d 16, 31 (D.D.C. 2003).  The second

clause of the exemption encompasses a broader range of information, but requires an assessment

of whether disclosure poses a reasonable risk that the law could be circumvented.  See PHE, Inc.

v. United States Dep't of Justice, 983 F.2d 248, 252 (D.C. Cir. 1993).  Both portions of Exemption

7(E) require that the information withheld relate to law enforcement investigations or

prosecutions.

Based upon an in camera review of the SAMEPH, the Court concludes that Exemption

7(E) has been properly invoked to shield information concerning: (1) the transport, seizure,

storage, testing, physical security, evaluation, maintenance, and cataloguing of, as well as access

to, seized property; (2) the process by which seized materials are returned to their rightful owners;

(3) administering on site mitigation, based on factors that, if publicly known, would be easily

manipulable by targets; (4) procedures and techniques relating to the seizure and deactivation of

monetary instruments; (5) the names, and clues regarding the locations of, storage and transport

facilities, units, task forces, and methods; and (6) the titles of law enforcement officers and groups

responsible for making decisions significantly impacting or controlling the aforementioned

techniques and procedures, or responsible for implementing them.

Most of the information described is so specialized and/or unique that its existence -- or, at

the very least, either (a) the detailed circumstances of its use by Customs in the manner indicated,

or (b) its effectiveness -- is unlikely to be generally known.  Even assuming, however, that the

information is generally known, it would still be subject to categorical protection because its

disclosure would undermine or eliminate its value.  The information described is easily

manipulable, and if it fell into the hands of the wrong person, it could be used to facilitate

disruption, interception, or evasion of Customs' law enforcement objectives.  For example,

disclosure of this information would allow targets to intercept or re-route the transport process,

evade detection or apprehension, avoid seizure of illegal contraband, regain possession of

previously seized contraband, identify the individuals responsible for carrying out these law

enforcement functions (thereby placing their safety at risk[8]), develop more effective methods of

thwarting Customs' law enforcement objectives, and fine-tune their illegal pursuits.  See Castelli

Decl. at 9-10 ¶ 35; see also id. at 33 (discussing risk of circumvention in connection with "high 2"

withholdings).  In this way, disclosure would also present a significant danger that the information

could be used to circumvent the laws that Customs is responsible for enforcing.  This danger

meets -- indeed, exceeds -- the "reasonable expectation" calculus established by the exemption's

second clause.  Hence, this information is properly withheld under Exemption 7(E).[9]

Not all of the 7(E) withholdings are proper, however.  Most notably, information

concerning the destruction of seized property does not fall within Exemption 7(E)'s protective

umbrella.  As explained above, both clauses of Exemption 7(E) require that the information

shielded, at the very least, must be capable of use in law enforcement investigations or

---

[8]For this reason, some of the information is also properly withheld under Exemption 7(F) as
discussed infra.

[9]Plaintiff's assertion that the information does not qualify under Exemption 7(E) because an
individual cannot circumvent law enforcement objectives "after their property has been seized
and they have been assessed a penalty or liquidated damages," Pl.'s First Mem. Supp. at 8-9; see
also id. at 10, is nonsensical.  The information in the SAMEPH would be useful to the same
individual in better performing his illegal activities on a future occasion, and would also inform
other individuals regarding how best to obtain their illegal objectives.

prosecutions.  Once destroyed, objects previously seized cannot be used as evidence, cannot be

analyzed or tested, and cannot be examined.  Although they may previously have been used in a

law enforcement investigation or proceeding, once they are exposed to destruction, the agency has

determined that the items are no longer of any value to such efforts.  Indeed, the SAMEPH

unequivocally states that once seized property is no longer needed as evidence, it is subject to

destruction.  SAMEPH at 69 ¶ 19; id. at 103 ¶ 2.  It cannot seriously be contended, then, that

information concerning the destruction of seized property -- which occurs after the seizure and

investigation of the property is complete, and only after it is determined that the property will not

be used as evidence -- relates to a law enforcement investigation or prosecution.  Indeed, such

measures appear to relate only to the conservation of the agency's physical and monetary

resources.

That information may be withheld under Exemption 2, however.  The "predominant

internality" test is satisfied because the information neither regulates relationships among

members of the public nor concerns the agency's decision to pursue legal action against a citizen;

in no way, then, can the information be labeled "secret law."  The second prong of the "high 2"

calculus is also satisfied, because disclosure of these procedures would significantly compromise

lawful agency regulation in the following ways: (1) by providing substantial clues regarding the

frequency and location of destruction, which would facilitate the anticipation, surveillance, and

disruption of such proceedings; (2) by shedding light on the timing, frequency, and manner of

transporting the materials to be destroyed, which would facilitate interception, manipulation, or

control of the process, and theft of the contraband; and (3) by identifying the titles of officials and

group task forces responsible for transporting and inventory the contraband, as well as those responsible for implementing the destruction procedures, which could endanger the lives and safety of such officials.

### B. Exemption 7(F)

Exemption 7(F) protects information that could reasonably be expected to endanger the life or physical safety of any person.  5 U.S.C. § 552(b)(7)(F).  Although the exemption has traditionally been claimed in connection with names and other identifying criteria of individuals who may be endangered in the event of disclosure, its plain language supports a broader reach. See Living Rivers, Inc. v. United States Bureau of Reclamation, 272 F. Supp. 2d 1313, 1321-22 (D. Utah 2003) (relying on Exemption 7(F) to protect inundation maps on the theory that, in light of the increasing likelihood of terrorist attacks, disclosure could risk the lives of individuals located in downstream areas vulnerable to flooding if dams were deliberately breached); Larouche v. Webster, 1984 WL 1061 (S.D.N.Y. Oct. 23, 1984) (relying on Exemption 7(F) to protect a report describing a home-made firearm because law enforcement officials are regularly faced with dangers of armed confrontation, and disclosure would add to those dangers by allowing individuals to use law-enforcement expertise to construct firearms for use against law enforcement); cf. Ctr. for Nat'l Sec. Studies v. United States Dep't of Justice, 215 F. Supp. 2d 94, 106, 108-09 (D.D.C. 2002) (relying on Exemption 7(F) to protect dates and locations of detainees' arrests, detentions, and releases).

"In evaluating the validity of an agency's invocation of Exemption 7(F), the court should 'within limits, defer to the agency's assessment of danger.'" Garcia v. United States Dep't of

Justice, 181 F. Supp. 2d 356, 378 (S.D.N.Y. 2002) (quoting Linn v. United States Dep't of Justice,

1995 WL 631847, at *9 (D.D.C. Aug. 22, 1995)).  Based upon its in camera review of the

SAMEPH, together with the Vaughn index and Castelli declaration, the Court concludes that

Customs has properly withheld the following types of information under Exemption 7(F):  (1)

information regarding the seizure, location, placement, storage, possession, physical security,

inventory, testing, and evaluation of, and access to, seized contraband; and (2)  the titles of

employees, groups, and task forces responsible for the seizure, storage, possession, physical

security, inventory, testing and evaluation of seized contraband.

As set forth in Customs' declarations and memoranda, its officers handle sensitive,

valuable, and illegal merchandise.  Castelli Decl. at 9 ¶ 33.  This reality puts Customs' officials at

risk from individuals who would seek to acquire such items.  Id. at 10-11 ¶ 36.  Moreover,

innocent third parties located in the vicinity of Customs' officials, activities, or seized contraband

are also at risk.  Id.; see Garcia, 181 F. Supp. 2d at 378 (making clear that Exemption 7(F)

encompasses the protection of unknown individuals other than law enforcement personnel).  In

light of the information's sensitive subject matter, the nature of Customs' law enforcement duties,

and the inherent danger associated with the items that Customs regularly handles, the Court is

convinced that disclosure may reasonably be expected to endanger the life or physical safety of

both Customs officials and innocent bystanders.

III.    **Segregability Determination**

Once an agency identifies information that it believes is exempt, it must undertake a

"segregability analysis."  The purpose of this assessment is to separate exempt material from any

non-exempt material, and to produce the responsive non-exempt material.  See Vaughn, 484 F.2d

at 825 (stating that "an entire document is not exempt merely because an isolated portion need not

be disclosed.  Thus the agency may not sweep a document under a general allegation of exemption,

even if that general allegation is correct with regard to part of the information.").  This exercise is

mandated by FOIA itself, which provides that any "reasonably segregable" information in exempt

documents must be disclosed after redaction of exempt information, unless the non-exempt

portions are "inextricably intertwined" with exempt portions.  5 U.S.C. § 552(b); Wilson, 414 F.

Supp. 2d at 15 (citing Trans-Pacific Policing Agreement v. United States Customs Serv., 177 F.3d

1022, 1028 (D.C. Cir. 1999)); Mead Data Central, 566 F.2d 242, 260 (D.C. Cir. 1977).  "The

'segregability' requirement applies to all [§ 552] documents and all exemptions in the FOIA."

Schiller, 964 F.2d at 1209 (quoting Center for Auto Safety v. EPA, 731 F.2d 16, 21 (D.C. Cir.

1984)).  The Court is required to make a specific finding as to segregability.  Id.; see also Trans-

Pacific, 177 F.3d at 1028.  The general application of this segregability analysis was explained in

the Court's prior opinion.  See Herrick's, 2005 WL 3274073, at **3-4.

    The SAMEPH is a dense and lengthy document.  The Court is confident that, based on the

declaration submitted, the Vaughn index, and the hand-annotated version of the SAMEPH it has

now reviewed, Customs undertook a line-by-line, good-faith effort to excise and disclose all non-

exempt portions of the SAMEPH in response to the Court's earlier directive.  However, some

mistakes were made.  Although the mistakes are relatively few in number and not necessarily

responsive to plaintiff's objectives, they do concern the type of material that FOIA seeks to make

public -- specifically, references and citations to statutory authority, as well as non-analytical

synopses of what the law requires.[10]  It is axiomatic that "information clarifying substantive or

procedural law must be disclosed."  Cox, 576 F.2d at 1309. This information appears to have been

lumped in with exempt material and similarly designated as protected.  Because Exemptions 2,

7(E), and 7(F) do not protect this information, summary judgment will be granted in favor of

plaintiff in this limited regard.  Customs is therefore directed to disclose the information identified

in footnote ten of this opinion to plaintiff.

---

[10]See SAMEPH at 66 ¶ 10, sent. 5 (describing the law of some judicial circuits regarding
forfeiture in light of the Eight Amendment); id. at 79 ¶ 3 sent. 1 (describing the course of action
to be taken when Customs does not possess statutory authority for forfeiture); id. at 79 ¶ 3 sent. 2
(describing the requirements of due process when investigative and judicial activity has been
completed and none of the earlier-specified forfeiture options are possible); id. at 83 ¶ 1(e) sents.
1, 2 (describing the effect of, and providing examples of, liens on commercial vessels); id. at 83 ¶
1(f), sent. 2 (describing the impact of a vessel's poor functionality upon its fair value and ultimate
sale price); id. at 84 ¶ 1(g) sents. 2 -5 (describing the drawbacks associated with hiring a crew to
pilot the vessel into port, and outlining the responsibilities of Customs with respect to non-
incarcerated crewmembers); id. at 84 ¶ 2(b) sent. 2 (describing the return of personal effects to a
violator when not required as evidence); id. at 88 ¶ 3 sent. 4 (describing the mandates of due
process when forfeiture is not sought and all investigative activity has been completed); id. at 90
¶ 1 sent. 1 (differentiating classes of pornographic material); id. at 125 § 2.9.7 sent. 4 (describing
the law of some circuits regarding the substantiation of a random sample's representative
accuracy); id. at 126 § 2.10.1 sent. 9 (describing the applicability of CAFRA when both a Title
19 provision and another, non-exempt forfeiture provision are cited); id. at 126 sent. 11-14, 127
sent. 1 (describing the prohibitions of 17 U.S.C. §§ 602 and 603 and outlining the applicability of
CAFRA in some settings); id. at 129 sent. 4 (assessing remission of forfeiture and the
"substantially prevailing" standard); id. at 222 § 8.3.2 ¶ 2 sents. 3-4 (describing the law regarding
presumptions when a document is mailed).

      It is worth noting that if the exemption claimed for a specific piece of information does
not justify its withholding, then the information must be disclosed -- even if it may conceivably
fit within another exemption that was not claimed.  See id. at 152 § 3.5.8 sent. 2 (describing
persons and corporations against whom civil fines are usually not issued with respect to
counterfeit trademark violations); id. at 169-70 ¶ 4 (listing criteria for the characterization of a
surety as "significantly delinquent" and explaining the aggregation of multiple claims against
bonds); id. at 188 § 5.3.2. (listing criteria for installment payments); id. at 193 § 5.7.3 sent. 11
(describing write-off possibilities in certain cases).

**<u>CONCLUSION</u>**

For the foregoing reasons, Customs' motion for summary judgment will be granted in part

and denied in part, and plaintiff's motion will also be granted in part and denied in part.  Customs

shall release the information identified in footnote ten of this opinion.  A separate order has been

posted on this date.


                                                                      /s/  John D. Bates

                                                                 JOHN D. BATES
                                        United States District Judge


Dated:   June 30, 2006


*Copies to*:

Peter S. Herrick
3520 Crystal View Court
Miami, FL 33133-4025
(305) 858-2332
Fax: (305) 858-6347
Email: pherrick@bellsouth.net
     *Counsel for plaintiff*


Beverly Marie Russell
U.S. ATTORNEY'S OFFICE
Civil Division
555 4th Street, NW
4th Floor
Washington, DC 20530
(202) 307-0492
Fax: (202) 514-8780
Email: beverly.russell@usdoj.gov
     *Counsel for defendant*